IN THE CIRCUIT COURT OF THE NINTH JUDICIAL CIRCUIT, IN AND FOR OSCEOLA COUNTY, FLORIDA

GENEVIEVE DEVELVIS,

    Plaintiff,

vs.

CASE NO.:
DIVISION:

CARETENDERS VISITING SERVICES OF ORLANDO, LLC d/b/a MEDERI CARETENDERS,

    Defendant.
_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, Genevieve Develvis ("Develvis"), by and through her counsel, hereby files this Complaint and Demand for Jury Trial against Defendant, Caretenders Visiting Services of Orlando, LLC d/b/a Mederi Caretenders ("Caretenders"), and alleges as follows:

### NATURE OF ACTION

1. This action is brought pursuant to the Florida Private Sector Whistleblower Act, Florida Statute 448.101, et seq.

### JURISDICTION AND VENUE

2. The instant suit is a claim for damages in excess of $15,000.00. Jurisdiction is therefore proper in Circuit Court.

3. The acts and omissions giving rise to this action occurred in Osceola County, Florida. Venue is therefore proper in the Ninth Judicial Circuit.

### PARTIES

4. At all times material hereto, Develvis was a resident of Lake County, Florida.

EXHIBIT A

5. At all times material hereto, Almost Family, Inc. ("AFAM") was a Delaware corporation doing business in Osceola County, Florida.

6. At all times material hereto, National Health Industries, Inc. was a Kentucky corporation doing business in Osceola County, Florida, and is a subsidiary of AFAM.

7. At all times material hereto, Caretenders Visiting Services of Orlando, LLC d/b/a Mederi Caretenders, was a limited liability company and a subsidiary of National Health Industries, Inc., and was doing business in Osceola County, Florida.

8. At all times material hereto, Caretenders was an "employer" as defined by section 448.101(3), Florida Statutes, because it employed ten or more persons.

9. At all times material hereto, Caretenders was the employer of Develvis.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

10. Develvis began working for AFAM when it acquired her former employer, Omni Healthcare, in 2014.

11. Develvis was an office manager for Omni Healthcare and had worked for the company for six years.

12. When Omni Healthcare merged with AFAM, Develvis was offered a position as a Clinical Team Assistant in Caretenders, which she understood to be a position similar to what she had held for the past six years.

13. Develvis accepted the new role offered to her and transferred to the Mederi office in Kissimmee, Florida, in August 2014.

14. Upon joining Caretenders, Develvis was assigned to take over final billing.

15. Develvis quickly grew concerned regarding the state of the company's patient charts and billing records.

16. Patient records and charts were scattered in disarray throughout the office, along with company personnel records and other materials.

17. Patient records more than a year old were stacked throughout the office, unfiled.

18. Patient charts did not contain complete records and, often, the records that were present did not support the level of billing.

19. For example, Develvis encountered files without documentation or physician's orders supporting changes to the plan of treatment, without record of face to face meetings with the physician, and even obviously altered records.

20. This disorganization, untimeliness, and inaccuracy had resulted in a billing deficit of approximately half a million dollars and a backlog of hundreds of charts.

21. In her second week with Caretenders, Develvis approached the Executive Director of Operations, Anquin Gant, and expressed her concerns regarding the state of the patient charts.

22. Develvis offered to show Mr. Gant examples of the patient chart issues that she was encountering, but he declined.

23. Develvis also brought these issues to the attention of her immediate supervisor, Pegi Ramos, RN Director.

24. Unfortunately, instead of addressing the underlying problems such as failure to follow-up on patient treatment plans by obtaining physician orders for the plan of care, face to face documentation, and determining the final status of the patient while on service; visit notes, transfers, and discharges were often missing or non-existent.

25. Ms. Ramos instructed clerical team members, including Develvis, to unlawfully alter patient charts in order to bill them. Develvis refused.

3

26. Unfortunately, because the charts were incomplete and inaccurate, Develvis and her colleagues were unable to release the charts for billing.

27. Again, rather than addressing the underlying issues that caused the billing backlog, Ms. Ramos and Mr. Gant instead pressured staff, including Develvis, to release patient charts more quickly.

28. Ms. Ramos routinely threatened them with the loss of their employment if they failed to do so.

29. Realizing that the objections and concerns that she had expressed to Mr. Gant and Ms. Ramos were being ignored, and concerned about the potential liability issues involved, Develvis contacted Caretenders' Human Resources office on November 17, 2014.

30. Develvis spoke to Amy Rose Olds in Human Resources on that date and advised her of the many compliance problems within the office and the failure of Mr. Gant to address the issues.

31. Develvis requested that someone from Human Resources and from Compliance visit the office in the hope of obtaining resolution of its many problems, including the patient issues that she had uncovered.

32. Ms. Olds referred Develvis' complaints to the Regional Director of Operations, Jean Westin, who called Develvis on or about December 4, 2014.

33. Develvis again reported the ongoing problems in the office, including the serious issues with patient charts.

34. Develvis even specifically informed Ms. Westin about a record that had been whited-out and altered to be submitted as substantiation for an otherwise unbillable chart.

4

35. Ms. Westin told Develvis that she would come to the office to address these significant issues, but she never did.

36. Danielle Kirkland, a Regional Director from Tampa, did visit the Kissimmee office the week before Christmas in 2014 and returned on or about January 7, 2015.

37. Ms. Kirkland spent the majority of that time in conference with Ms. Ramos.

38. As Develvis later learned, Ms. Kirkland had not been sent in response to her complaints.

39. Ms. Kirkland was in the Kissimmee office on unrelated business and never met with Develvis regarding the issues that she had raised.

40. Frustrated by the continuing lack of response to the serious concerns that she had reported, Develvis again complained to Mr. Gant about the conditions of the Kissimmee office and the patient charts and was again disregarded.

41. Because the serious concerns that she had raised were again being ignored, on January 14, 2015, Develvis again contacted Ms. Olds in Human Resources asking for intervention and expressing her and other staff's concerns of retaliation from management.

42. The next day, Develvis observed Ms. Kirkland as she was reviewing old discharge records.

43. Ms. Kirkland asked Develvis why the records she was reviewing were so old.

44. Develvis advised Ms. Kirkland of the considerable backlog that she was attempting to resolve and that she had already contacted Mr. Gant, Ms. Olds, and Ms. Westin regarding these issues, to no avail.

45.   The following day, Ms. Kirkland met with the Kissimmee office staff during their regular morning meeting, during which staff members each expressed their concerns regarding the operation of the Kissimmee office, echoing Develvis' previous complaints.

46.   On January 26, 2015, Develvis received a call from Ms. Olds in Human Resources who told her that the company had received an anonymous letter detailing numerous complaints, among them some of the same issues that Develvis had previously raised, such as the alteration of patient records.

47.   Develvis stated that she did not send the anonymous letter.

48.   When she concluded the call, Develvis and her colleague Jan Chavez were the only individuals questioned regarding the anonymous letter.

49.   Later Mr. Gant asked Develvis and Ms. Chavez to produce examples of records being altered as alleged in the letter.

50.   In response, Develvis provided Mr. Gant copies of face-to-face documentation that had been whited-out and altered along with documentation confirming the alteration.

51.   Develvis had tried repeatedly to get Mr. Gant to address the problems with chart documentation since the very early days of her employment with Caretenders, only to be ignored.

52.   Now however, in response to the anonymous complaint to Human Resources, Mr. Gant opined that all employees should be given a fair opportunity to have their complaints investigated.

53.   Develvis reminded Mr. Gant of her many attempts to obtain company resolution of these issues and expressed her disappointment that any company would tolerate these practices.

6

54. The following day, Mr. Gant instructed Ms. Kirkland to obtain from Develvis the original whited-out record that he had been given a copy of the day before.

55. As soon as she produced that record to Ms. Kirkland, Develvis' employment was suspended indefinitely without pay and, on February 2, 2015, her employment was abruptly terminated.

## COUNT I
## FLORIDA PRIVATE SECTOR WHISTLEBLOWER ACT
### Florida Statute 448.101 et seq.

56. Develvis hereby incorporates the allegations set forth in Paragraphs 1 through 55 of the Complaint as if fully set forth herein.

57. Plaintiff objected to, or refused to participate in, practices of Defendant which were in violation of section 395.302, Florida Statutes and the Health Insurance Portability and Accountability Act of 1996 (HIPAA). Plaintiff thereby engaged in protected conduct under the Florida Private Sector Whistleblower Act, Florida Statute 448.101 et seq.

58. As a direct result of her protected conduct, Defendant subjected Plaintiff to a retaliatory personnel action by terminating her employment.

59. As a direct, proximate and foreseeable result of Defendant's retaliatory actions, Plaintiff has suffered past and future pecuniary losses, emotional pain, suffering, embarrassment, humiliation, inconvenience, mental anguish, loss of enjoyment of life, loss of dignity, emotional distress and other non-pecuniary losses and intangible injuries.

60. Plaintiff has retained counsel to represent her in this matter and has incurred, and will continue to incur, attorney's fees and costs.

## DEMAND FOR RELIEF

WHEREFORE, Develvis demands judgment against Defendant for:

    a.    Back pay;

    b.    Front pay;

    c.    Compensatory damages;

    d.    Attorneys' fees and costs of this action; and

    e.    Such other relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff, Genevieve Develvis, hereby demands trial by jury on all issues so triable as a matter of right.

Date: January 26, 2017

Respectfully submitted,

s/ Kimberly D. Webb
Jill S. Schwartz, Attorney at Law
Florida Bar No. 523021
Kimberly D. Webb, Attorney at Law
Florida Bar No. 0537306
JILL S. SCHWARTZ & ASSOCIATES, P.A.
655 West Morse Blvd., Ste. 212
Winter Park, Florida 32789
Telephone: (407) 647-8911
Facsimile: (407) 628-4994
E-mail: jschwartz@schwartzlawfirm.net
E-mail: kwebb@schwartzlawfirm.net
Attorneys for Plaintiff